UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KEVIN BRODLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-01099-JRS-TAB |
| | ) | |
| MURAT POLAR,[1] | ) | |
| AGNES A. OPOKU, | ) | |
| WEXFORD OF INDIANA, LLC.,[2] | ) | |
| | ) | |
| Defendants. | ) | |

**Entry Granting Defendants' Unopposed Motion for Summary Judgment**

Plaintiff Kevin Brodley filed this civil rights action alleging that while incarcerated at Plainfield Correctional Facility, his Eighth Amendment right to constitutionally adequate medical care was violated. Dkt. 8 (Second Amended Complaint). Specifically, Mr. Brodley alleges that Murat Polar, M.D., and Agnes A. Opoku, N.P., failed to provide adequate medication to treat his serious medical needs associated with his diabetes, neuropathy and sciatica. They also allegedly denied access to an outside specialist. In addition, Mr. Brodley alleges that Wexford of Indiana, LLC, is liable for its policy or practice of denying necessary medications and access to outside specialists.[3] Dkt. 12 (Screening Order). The defendants now seek resolution through summary judgment of the claims alleged against them. For the reasons explained below, the defendants' unopposed motion for summary judgment filed August 20, 2020, dkt. [90], is **granted.**

---

[1] The **clerk is directed** to update the docket to reflect the correct spelling of Defendant Murant Polar's name as "Murat Polar."
[2] The **clerk is directed** to update the docket to reflect that the legal name of Wexford Medical Corp. is "Wexford of Indiana, LLC."
[3] All other claims were dismissed at screening or through settlement. See dkts. 12 and 100.

## I. Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and

the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573-74 (7th Cir. 2017).

Mr. Brodley did not file a response to the motion for summary judgment. *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission."). By not responding to the motion for summary judgment, Mr. Brodley conceded to the defendants' version of the facts. *Brasic v. Heinemann's Inc.,* 121 F.3d 281, 286 (7th Cir. 1997). This is the result of Local Rule 56-1, of which Mr. Brodley was notified. See dkt. 93. This does not alter the standard for assessing a Rule 56 motion but does "reduc[e] the pool" from which the facts and inferences relative to such a motion may be drawn. *Smith v. Severn,* 129 F.3d 419, 426 (7th Cir. 1997).

## II. Undisputed Facts

Mr. Brodley has been housed at the Plainfield Correctional Facility ("PCF") since late 2017. Dkt. 92-5 at 14: 13-21; 15: 4-9 (Deposition of Kevin Brodley). He has multiple medical conditions that have required treatment.

### A. Bipolar Disorder

Mr. Brodley has been diagnosed as having Bipolar Disorder and has been treated with Pamelor and Remeron during his time at PCF. Dkt. 92-5, at 16: 13-23.

### B. Neuropathy

Neuropathy is a comorbid condition of diabetes and is caused by high blood sugar levels, which injure nerves throughout the body. Dkt. 92-3 at ¶ 12. Diabetic neuropathy most often affects the patient's legs and feet. *Id.* Symptoms include pain and numbness in the legs. *Id.* The first-line

treatment for diabetic neuropathy is controlling the patient's blood sugar levels. *Id*. Further, the patient is encouraged to lose weight to facilitate circulation and relieve obstruction of veins and arteries. *Id.* Weight reduction also reduces the stress on the joints in the lower body and relieves some symptoms associated with diabetic neuropathy. *Id.* Finally, if the symptoms persist after the patient has brought their blood sugar levels back down to healthy levels, has lost weight, is exercising, and has stopped smoking, then pain management medication may be used to address diabetic neuropathy. *Id.* Pain management is the last line of treatment for diabetic neuropathy due to the related health concerns; pain medication does nothing more than mask the pain. *Id.* Therefore, pain medication provides little incentive for the patient to improve the cause of the neuropathy—high blood sugar levels—and the condition may worsen as a result. *Id.*

## C. Sciatica

Sciatica is a common condition which refers to back pain caused by pressure on the sciatic nerve. Dkt. 92-3 at ¶ 13. Typically, pain originates in the spine and radiates down one or both legs. *Id.* The first-line treatment for this condition is physical therapy and stretching in an effort to remove pressure from the nerve. *Id.* If the patient is overweight, weight reduction is encouraged to limit the pressure on the nerve and other joints in the lower body. *Id.* If conservative measures are unsuccessful, pain medications may be indicated, including Non-Steroidal Anti-Inflammatory Drugs ("NSAIDs"). *Id.*

## D. Diabetes

Mr. Brodley has also been a type-two diabetic for the entirety of his current incarceration. Dkt. 92-5 at 17: 11-20. Type-two diabetes is characterized by one of two scenarios: either the body does not produce enough insulin, or the body resists the insulin which it produces. Dkt. 92-4 at ¶ 7. Insulin is produced by the pancreas and serves the function of breaking down sugar and

carbohydrates contained in food. *Id.* The normal blood sugar level for a non-diabetic is below 140 mg/dL. *Id.* A blood sugar level between 140 and 199 indicates prediabetes where the patient is at risk of developing diabetes. *Id.* A blood sugar level greater than 200 for 2 hours indicates that the patient is diabetic. *Id.*

The typical treatment for type-two diabetes is to manage diet, exercise, and prescribe oral medication which stimulates the pancreas to produce insulin. *Id.*, at ¶ 8. Occasionally, type-two diabetics require insulin. *Id*. Insulin injections are used only when diet, exercise, and oral medication fail to correct the elevated blood sugar levels associated with type-two diabetes. *Id.* Importantly, type-two diabetics have functioning pancreases that produce insulin. *Id.* Therefore, even if a type-two diabetic is placed on insulin, if they lose weight, manage their diet appropriately, and exercise, then the patient could regain control of their elevated blood sugar and be taken off of insulin injections. *Id.*

A proper diabetic diet is one that contains dietary fiber and complex carbohydrates which are slowly broken down in the body by insulin. *Id.* at ¶ 9. Such diet should be as consistent as possible in terms of calories and carbohydrates in order to limit "peaks" (hyperglycemia) and "valleys" (hypoglycemia). *Id.* The diabetic diet ordered by providers and fulfilled by Aramark attempts to balance out carbohydrates by keeping the calories provided at a constant level. *Id.*

Type-two diabetes is monitored through periodic lab testing, including labs monitoring a patient's Hemoglobin A1c (a/k/a "A1c"). *Id.*, at ¶ 10. A patient's A1c reveals the patient's average blood sugar levels for the previous three months. *Id.* In essence, where an accu-check reading provides a snap shot of the patient's blood sugar at that particular time, an A1c lab provides the blood sugar levels for the previous three months in order to create a more complete picture as to the management of the condition. *Id.* An ideal range for A1c is below 6%. *Id.* Patients with an A1c

level between 6% and 6.5% are labeled as prediabetic. *Id.* Patients who have an A1c of 6.5% or above are considered diabetic. *Id.*

Generally speaking, the lower a diabetic's A1c the better the prognosis is for the patient. *Id.* Studies have found that lowering a patient's A1c by 1% reduces the risks of retinopathy, neuropathy, and kidney disease by up to 25%. *Id.* There are several ways that a patient can safely and quickly reduce his/her A1c, including: increase exercise, lose weight, follow the recommended treatment plan, eat a healthy diet, and routinely check his/her blood glucose so that high blood sugar levels may be corrected through additional insulin. *Id.*

Mr. Brodley undergoes "regular" laboratory testing approximately every 90 days. Dkt. 92-5 at 28: 7-16.

**E. Diabetes Medication**

Prior to entering the Indiana Department of Correction, Mr. Brodley was prescribed Glipizide 5 mg by his physician. Dkt. 92-5, at 17: 21-24. Glipizide is an oral medication used to treat type two diabetes. Dkt. 92-1 at ¶ 10. Glipizide is in a class of medication known as sulfonylureas. *Id.* Glipizide helps a patient's pancreas produce insulin by partially blocking potassium channels, thereby encouraging insulin production. *Id.*

Glimepiride is also a type of sulfonylureas which stimulates the release of insulin from the patient's pancreas in order to lower blood sugar. *Id.* at ¶ 11. Glipizide and Glimepiride are nearly identical in their function in the body. *Id.* at ¶ 12. Both medications belong to the same class of drug and both medications stimulate the release of insulin, thereby lowering the blood sugar in the short-term and lowering the A1c of the patient in the long-term. *Id.*

**F. Defendant Dr. Murat Polar**

Mr. Brodley had a total of one visit with Dr. Polar, which took place on August 3, 2018 at PCF. Dkt. 92-1 at ¶ 8 (Affidavit of Murat Polar, M.D). During this visit, Mr. Brodley was taken off of Glimepiride and placed back on Glipizide per Mr. Brodley's request. *Id.* He received Glipizide through the remainder of 2018. Dkt. 92-5 at 24: 10-12. After Mr. Brodley was placed back on Glipizide he was counseled that it may take some time for the medication to kick back in, "and it did." *Id.* at 27: 20-21.

**G. Defendant Agnes A. Opoku, N.P.**

Mr. Brodley was first seen and treated by NP Opoku, a licensed nurse practitioner, on September 18, 2018. Dkt. 92-3 at ¶ 16; Dkt. 92-4. NP Opoku advised Mr. Brodley that he needed to consistently check his blood sugar so that his condition could be effectively managed. Dkt. 92-3 at ¶ 16. During this visit Mr. Brodley was counseled to lose weight, as his weight registered at 350 pounds during the visit. *Id.* Mr. Brodley reported a pain score of 0 out of 10 during this visit. *Id.*

NP Opoku's foot screen indicated that Mr. Brodley experienced some loss of the protective sensation in his feet. *Id.* at ¶ 16. NP Opoku counseled Mr. Brodley that managing his A1c would lower his risk for comorbid conditions and would improve his overall health. *Id.*

At the time of Mr. Brodley's September 18, 2018, visit he was prescribed Neurontin 800 mg, two tablets, two times per day, meaning that his Total Daily Dose ("TDD") was 3200 mg, which is the maximum recommended dosage. *Id.* at ¶ 17. NP Opoku ordered labs to assess Mr. Brodley's A1c and monitor his GABA levels. Given Mr. Brodley's TDD, his GABA level should have registered around 4 +/- 0.5 subject to how much time passed between Mr. Brodley's most recent Neurontin intake and the lab testing. *Id.*

7

Mr. Brodley was prescribed 40 units of Novolin NPH insulin ("NPH") and 15 units of Novolin Regular ("Novolin R") at the time of his September 18, 2018 visit. These orders were valid through March 11, 2019. Dkt. 92-3 at ¶¶ 18 and 19. NPH is an intermediate acting insulin given to reduce blood sugar levels. *Id.* at ¶ 20. This medication is injected one to two times per day. NPH typically takes two to four hours to reach the bloodstream and is effective for 12 to 18 hours. *Id.* Novolin R is a fast-acting insulin which typically begins to take effect within half an hour after injection. *Id.* at ¶ 21. Novolin R reaches its peak effect for between 2.5-5 hours. *Id.* After that point, the effect gradually decreases until it is completely absorbed after approximately 8 hours. Novolin R is structurally identical to the insulin produced by the human pancreas. *Id.*

Novolin NPH and Novolin R are typically used in concert. Dkt. 92-3 at ¶ 22. Novolin R is given soon before or soon after food consumption and NPH is intended to control blood sugar levels irrespective of food intake. Together, these two types of insulin closely mimic a non-diabetic's insulin production in order to control blood sugar levels. *Id.*

Following her September 18, 2018 visit with Mr. Brodley, NP Opoku monitored his glucose readings and, on September 21, 2018, added an administration of 10 units of Novolin R at noon to Mr. Brodley's insulin regimen to attempt to lower his blood sugar. *Id.* at ¶ 23. This step was taken because while Mr. Brodley had been compliant with checking his blood sugar following his September 18, 2018 visit with NP Opoku, such accu-check results revealed that his blood sugar was persistently high. *Id.*

Following the adjustment NP Opoku made on September 21, 2018, she continued to monitor Mr. Brodley's glucose levels, which remained high. *Id.* at ¶ 24. Accordingly, NP Opoku made a second adjustment to Mr. Brodley's insulin regimen on October 4, 2018, this time increasing both the Novolin R and NPH in an attempt to lower his blood sugar. *Id.*

Mr. Brodley's lab results were provided to PCF on October 8, 2018. Dkt. 92-3 at ¶ 25. His A1c was 10.5 and his GABA level was 4.0. *Id.* Mr. Brodley was seen by Dr. Elrod on November 19, 2018. She did not change his medications, but counseled Mr. Brodley to stop purchasing high sugar foods.

NP Opoku next treated Mr. Brodley on December 12, 2018. Dkt. 92-3 at ¶ 27. NP Opoku noted that Mr. Brodley's A1c results from October were elevated. *Id.* Mr. Brodley indicated that he had done all that had been asked of him, but also indicated that he made food purchases from commissary including nuts, juice, potato chips, hard mixed candy, cake, popcorn, and oatmeal pie. *Id.* These purchases would impact his A1c because they are inconsistent and are not accounted for in his insulin TDD. *Id.* Mr. Brodley was negative for blurred vision, headaches, and foot ulcers during this visit. His weight was 350 pounds at the time of this visit. *Id.* NP Opoku counseled Mr. Brodley to be compliant with his various medications and further counseled him to get his blood sugar tested twice per day so that his treatment could be adjusted moving forward as necessary. *Id.* NP Opoku also counseled him to increase his physical activity as tolerated and follow a healthy diet in order to facilitate weight loss. *Id.*

Prior to her December 12, 2018 visit with Mr. Brodley, NP Opoku submitted a Formulary Exception Request ("FER") for Mr. Brodley's Neurontin to the Regional Medical Director. Dkt. 92-3 at ¶ 28. NP Opoku requested a refill for 90 days. *Id.* On December 5, 2018, the Regional Medical Director approved the order for 30 days. *Id.*

Mr. Brodley's December 27, 2018, lab results reflected that his GABA level registered at 1.2. *Id.* at ¶ 29. Given the frequency of Mr. Brodley's Neurontin and his TDD, his level should have been 3-4 times higher, consistent with the levels observed in October 2018 and previous lab results. *Id.*

Neurontin (a.k.a. Gabapentin) is an antiseizure medication which is sometimes prescribed to treat neuropathic type pain. Dkt. 92-1 at ¶ 16. Neurontin works by altering the electrical activity in the brain and influencing various neurotransmitters such as GABA and glutamate. *Id.* Specifically, Neurontin increases the availability of GABA, a nerve-exciting agent, and decreases glutamate levels, which is intended to create balance in the chemicals associated with producing seizure-like activity. *Id.* Neurontin is a highly abused and trafficked medication in the prison context. *Id.* at ¶ 17. When the medication is taken in large quantities—especially when combined with other medications—it can produce a "high." *Id.* This is why GABA levels are routinely checked to ensure that the patient is actually taking the medication rather than hoarding, diverting, or selling it. *Id.*

Mr. Brodley had a GABA level far below what was expected for a patient receiving 3200 mg of Neurontin per day. *Id.*, at ¶ 18. His very low GABA level of 1.2 in December 2018 was not a statistical error, but instead indicated that he had not been taking his medication with any consistency. *Id.* When a patient does not take his/her medication, the medication can and should be discontinued because hoarding medication in order to consume it in large quantities could cause permanent injury or death. *Id.*

Once Mr. Brodley was no longer provided Neurontin, he had access to other pain medications, some of which are specifically used to treat neuropathic-type pain, including Cymbalta, Remeron, and Pamelor. *Id.* at ¶ 19. It is important when prescribing medication to take into account the other medication the patient is prescribed. *Id.* In Mr. Brodley's case, he was prescribed a number of medications by mental health which are also commonly used to address neuropathic pain. *Id.*

NP Opoku next treated Mr. Brodley on December 31, 2018. Dkt. 92-3 ¶ 31. She explained that his GABA level in December registered at a low 1.2 and that this level is far below what would be expected given Mr. Brodley was prescribed 3200 mg of Neurontin per day. *Id.* NP Opoku further explained that Mr. Brodley needed to lower his A1c which would improve his symptoms associated with diabetic neuropathy. *Id.* Mr. Brodley's order for Neurontin was set to expire on January 3, 2019. *Id.*

Mr. Brodley was again seen and assessed by NP Dawson on January 16, 2019. Dkt. 92-3 at ¶ 32. NP Dawson discussed with Mr. Brodley his low December GABA level and also reviewed his commissary purchases with him, noting that he made poor choices in terms of his commissary purchases, ordering cookies, candy, chips, and donuts. *Id.* NP Dawson noted that although Mr. Brodley was prescribed an 1800-calorie diet he had not lost weight, had a BMI of over 45, and had elevated A1c labs. *Id.*

NP Opoku next treated Mr. Brodley on January 25, 2019. Dkt. 92-3 at ¶ 33. During this appointment he complained about right thigh pain, stating that it was aggravated by moving, walking, and standing. *Id.* Mr. Brodley's blood pressure and oxygen saturation rate were checked during this visit, both of which were within the normal limits. *Id.* His weight was 355 pounds. To address Mr. Brodley's reported pain, NP Opoku started a trial of Cymbalta to see if taking the medication in the morning would provide pain relief throughout the day. *Id.* NP Opoku further advised Mr. Brodley to wear proper footwear and to exercise. *Id.*

Cymbalta (a/k/a Duloxetine) is an antidepressant which has been shown to be effective in managing nerve pain when prescribed in low doses. Dkt. 92-3 at ¶ 37. While effective for treating nerve pain, Cymbalta takes time to build up in a patient's system, which can take up to 6 weeks. *Id.* Cymbalta is a Selective Serotonin and Norepinephrine Reuptake Inhibitor ("SNRI"), which

works by inhibiting the reabsorption of both Serotonin and Norepinephrine in the nervous system. *Id.* Given Mr. Brodley's reported neuropathic pain, NP Opoku prescribed Cymbalta to attempt to reduce such reported pain. *Id.*

NP Opoku next treated Mr. Brodley on February 12, 2019. Dkt. 92-3 at ¶ 39. His blood pressure and oxygen saturation levels were within the normal limits. *Id.* Mr. Brodley's weight was 362 pounds at the time of this visit. *Id.* He stated that he wanted something for his pain, indicating that he had taken Pamelor 100 mg for years and it had not addressed his pain. *Id.* NP Opoku noted that Mr. Brodley's A1c as of January 16, 2019 was 10.6, which was a slight increase from the October A1c. *Id.* NP Opoku again counseled Mr. Brodley that lowering his A1c would address his reported nerve pain and would allow him to exercise and lose weight. NP Opoku further reiterated her previous advice that Mr. Brodley eat healthy to lose weight and reduce his symptoms associated with his reported nerve pain. *Id.*

Mr. Brodley had a provider visit with Physician Assistant Sheri Wilson on March 13, 2019. *Id.* at ¶ 40. Mr. Brodley requested that he be evaluated for his right leg neuropathic pain. *Id.* He reported that Pamelor did not work for his pain and requested that he be seen by a provider outside the prison for his reported pain. *Id.* PA Wilson offered Mr. Brodley Mobic. Although Mr. Brodley has an Aspirin allergy, he reported that he could take Non-Steroidal Anti-Inflammatory Drugs ("NSAIDs"). *Id.* PA Wilson noted that Mr. Brodley was unwilling to discuss weight loss or exercise, instead wanting to discuss only pain medication to mask his reported pain. *Id.* PA Wilson noted that she communicated the life-long nature of neuropathy to Mr. Brodley, who again expressed no interest in managing his diabetes or lowering his weight. *Id.* Following this visit, PA Wilson wrote a prescription for Mobic 7.5 mg, which was initially valid from March 14, 2019 to March 27, 2019. *Id.* Mobic (a/k/a Meloxicam) is a type of NSAID which reduces pain and

inflammation by blocking cyclooxygenase. *Id.* at ¶ 41. Mobic is used as an anti-inflammatory, analgesic, and antipyretic. *Id.*

NP Opoku next treated Mr. Brodley on March 28, 2019. Dkt. 92-3 at ¶ 42. Mr. Brodley's blood pressure and oxygen saturation were both within the normal limits. *Id.* Mr. Brodley complained of right thigh pain during this visit, which he stated was aggravated by movement and standing. *Id.* He reported tingling in his legs and stated Pamelor did not help his pain. *Id.* Upon NP Opoku's examination of Mr. Brodley's legs she noted that there was no redness, bruising (edema), or warmth. *Id.* NP Opoku further noted that Mr. Brodley's pulse was good in his lower extremities and that he appeared to be able to move his right leg without issues. *Id.* To address Mr. Brodley's reported pain, NP Opoku offered him Tylenol— an analgesic—which he declined. *Id.* NP Opoku again encouraged Mr. Brodley to lose weight and get his A1c under control to reduce and relieve his symptoms. *Id.* NP Opoku noted that Mr. Brodley's A1c registered at 9.1 on March 14, 2019, which represented a drop from the previous level but which was still elevated. *Id.* Finally, NP Opoku encouraged Mr. Brodley to do stretching exercises to address his reported sciatica. *Id.*

Mr. Brodley was provided medical orders for an 1,800-calorie diabetic diet with evening snack during all relevant periods of time. *Id.* at ¶ 45. This diet was designed to facilitate weight loss, as Mr. Brodley was and is a type-two diabetic whose symptoms associated with this condition would resolve if he lost significant weight. *Id.* It was consistently communicated to Mr. Brodley that weight loss and healthy diet are paramount in managing this condition. However, in spite of this advice and in spite of his medical diet orders for an 1,800-calorie diet, Mr. Brodley gained weight. *Id.* Mr. Brodley admitted to making several commissary purchases consisting of junk food, which his insulin regimen was not designed to account for. *Id.*

Mr. Brodley's diabetic flow sheets between June 2018 and March 2019 indicate that he either refused or missed several accu checks. Dkt. 92-3 at ¶ 46. It is crucial that diabetics monitor their blood sugar and take their insulin. *Id.* It was especially important for Mr. Brodley to monitor his glucose levels because his insulin was being adjusted to account for high blood sugar levels. *Id.* Mr. Brodley's Medication Administration Records ("MARs") indicate that he skipped or refused several insulin doses, occasionally skipped or refused doses of both Remeron and Pamelor, but did not appear to miss many doses of Neurontin. *Id.* ¶ 47.

**H. Specialist**

There is no indication that referral to a specialist—whether it be an endocrinologist or neurologist—was clinically indicated to treat Mr. Brodley. Dkt. 92-1 ¶ 21. Instead, Mr. Brodley was advised that his symptoms would improve significantly if he lowered his A1c and lost weight. *Id.* To accomplish these goals, Mr. Brodley's insulin regimen was increased periodically, he was provided oral diabetic medication, and he was provided a medical diet which limited his caloric intake. *Id.* Mr. Brodley was seen at least once per month, and sometimes more frequently, in order to monitor his diabetes and associated comorbidities. *Id.* Labs were collected routinely to monitor his conditions. *Id.* As general practitioners licensed to practice medicine in the state of Indiana, the medical staff at PCF were competent to manage Mr. Brodley's diabetes. However, medical staff could not force Mr. Brodley to follow the medical advice offered to him in order to manage his condition and his comorbid diabetic neuropathy. *Id.*

### III. Discussion

This action is brought pursuant to 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Section 1983 is not itself a source of substantive rights; instead it is a means for vindicating federal rights elsewhere conferred. *Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir. 1997) (*citing Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "[T]he first step in any [§ 1983] claim is to identify the specific constitutional right infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Constitutional claims are to be addressed under the most applicable provision. *See Conyers v. Abitz*, 416 F.3d 580, 586 (7th Cir. 2005).

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). However, "not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.'" *Eagan v. Dempsey*, No. 17-3184, — F.3d —, 2021 WL 456002, at *13 (7th Cir. Feb. 9, 2021) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)). "To determine if the Eighth Amendment has been violated in the prison medical context, we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Peterson v. Wexford Health Sources, Inc.*, No. 19-2592, 2021 WL 243524, at *3 (7th Cir. Jan. 26, 2021) (quoting *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc)).

In this case, the defendants concede that both Mr. Brodley's type-two diabetes and comorbid diabetic neuropathy constitute objectively serious medical conditions under the Eighth Amendment. Dkt. 91 at p. 23.  However, the defendants argue that Mr. Brodley cannot satisfy the subjective element of the deliberate indifference inquiry as to the individual providers as to any of his medical conditions, nor can he demonstrate that any alleged Wexford policy was the moving force behind any alleged constitutional injury.

"The second element of deliberate indifference is proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations and citations omitted). A defendant must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)). *See also Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Therefore, to survive summary judgment Mr. Brodley must have evidence of acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. "[w]ithout more, a mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016).

"A cause of action based on a physician's choice among courses of treatment cannot be sustained under the Eighth Amendment." *Eagan v. Dempsey*, No. 17-3184, 2021 WL 456002, at *17 (7th Cir. Feb. 9, 2021) (citing *McGowan v. Hulick*, 612 F.3d 636, 641 (7th Cir. 2010) ("[T]his dispute is over nothing but the choice of one routine medical procedure versus another, and that is not enough to state an Eighth Amendment Claim."); *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir.

2008) ("There is not one 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field."); *Abdul-Wadood v. Nathan*, 91 F.3d 1023, 1024 (7th Cir. 1996) ("[D]isagreement with the selection of medicine and therapy falls well short of demonstrating deliberate indifference to a serious medical need.")).

For the reasons explained below the undisputed evidence reflects that neither Dr. Polar nor NP Opoku were deliberately indifferent to Mr. Brodley's serious medical needs, nor were Mr. Brodley's rights violated because of Wexford's polices.

**A. Dr. Polar**

Dr. Polar saw Mr. Brodley once during the relevant period of time, during which visit Mr. Brodley was prescribed Neurontin and reported that his only issue was that he wanted to be placed back on Glipizide, which was done as a result of the visit. Therefore, to the extent that Mr. Brodley asserts a deliberate indifference claim as to Dr. Polar, Mr. Brodley cannot satisfy the subjective component of the standard because he received the medical treatment he requested, and no misconduct of any kind has been identified.

**B. NP Opoku**

NP Opoku had a number of interactions with Mr. Brodley between September 2018 and March 2019. Mr. Brodley's medical care for his type-two diabetes, comorbid diabetic neuropathy, and related sciatica must be viewed in its entirety. *Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016).

The undisputed record reflects that NP Opoku responded appropriately when Mr. Brodley raised concerns. Importantly, she was responsive to Mr. Brodley's high blood sugar readings, increasing his insulin orders to lower his blood sugar levels. She repeatedly counseled Mr. Brodley on the importance of lowering his A1c in order to manage both his type-two diabetes and his diabetic neuropathy. She provided further counseling on the importance of losing weight to resolve

Mr. Brodley's diabetic neuropathy and sciatica. NP Opoku submitted two FERs for Mr. Brodley to receive Neurontin. Later, NP Opoku prescribed Cymbalta, instructed Mr. Brodley to stretch, and reiterated her previous advice to lose weight, exercise, and lower his A1c through insulin and accu-check compliance.

Mr. Brodley's medical care was constitutionally adequate. NP Opoku provided Mr. Brodley sound medical advice aimed at addressing his medical concerns. He was offered various pain medications and was instructed on numerous occasions by medical providers that lowering his A1c was paramount for both his type-two diabetes and diabetic neuropathy. Accordingly, NP Opoku is entitled to judgment as a matter of law.

### C. Wexford

Finally, Mr. Brodley alleged that Wexford is liable for unconstitutional policies that resulted in his inability to see a specialist or obtain specific medications. There is no evidence that Mr. Brodley was injured by any such policies. In addition, Mr. Brodley has received constitutionally adequate medical care and there is no evidence to support a finding that a referral to a specialist or the provision of any other medication was clinically indicated. In the absence of a constitutional injury, Mr. Brodley cannot succeed on his claim against Wexford. *See Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 463 (7th Cir. 2020); *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016).

### IV. Conclusion

Mr. Brodley has not identified a genuine issue of material fact as to his claims in this case, and the defendants are entitled to judgment as a matter of law. Accordingly, the defendants' motion for summary judgment, dkt [90], is **granted.**

Judgment consistent with this Order and the Screening Entry of May 31, 2019, shall now issue.

IT IS SO ORDERED.

Date: 2/22/2021

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

KEVIN BRODLEY
856293
PLAINFIELD - CF
PLAINFIELD CORRECTIONAL FACILITY
Inmate Mail/Parcels
727 MOON ROAD
PLAINFIELD, IN 46168

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Blair Martin Roembke
EICHHORN & EICHHORN LLP (Indianapolis)
broembke@eichhorn-law.com

Michael Roth
EICHHORN & EICHHORN
mroth@eichhorn-law.com

Jarod Zimmerman
KATZ  KORIN CUNNINGHAM, P.C.
jzimmerman@kkclegal.com